IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dennis Lee Brown, | ) | C/A No. 0:07-3919-RBH-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 DSC et seq.  The plaintiff, Dennis Lee Brown ("Brown"), brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Defendant, Commissioner of Social Security ("Commissioner"), denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

On January 22, 2004, Brown applied for SSI and DIB.  Brown's applications were denied and he requested a hearing before an administrative law judge ("ALJ").  After an initial hearing held on March 5, 2005, at which Brown appeared and testified, the ALJ requested a comprehensive medical examination.  Brown was unrepresented at the first hearing, but subsequently obtained an attorney, who requested an additional hearing.  A supplemental hearing was held on March 14, 2006, at which Brown again testified.  The ALJ, after hearing the testimony of a vocational expert, concluded that work exists in the national economy which Brown can perform.  The ALJ issued a decision dated July 28, 2006 denying benefits.

Brown was forty-six years old at the time of the ALJ's decision. He has a high school education and past relevant work experience in unskilled labor. Brown alleges disability since March 6, 2002 due to diabetes; high blood pressure; poor circulation; bipolar disorder; neuropathy in legs and feet; pain in his back, shoulders and head; (Tr. 45), as well as morbid obesity; schizoaffective disorder; diabetic retinopathy; and tinnitus. (Tr. 514-520, 524.)

The ALJ found:

1.    The claimant meets the insured status requirements of the Social Security Act through January 1, 2005.

2.    The claimant has not engaged in substantial gainful activity since March 6, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

\*    \*    \*

3.    The claimant has the following severe impairments: morbid obesity, depression, and diabetes mellitus (20 CFR 404.1520(c) and 416.920(c)).

\*    \*    \*

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*    \*    \*

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work. He can lift up to twenty pounds occasionally and ten pounds frequently. He can sit, stand, and/or walk for six hours each during a eight-hour work day. He is unable to perform overhead work due to obesity. He has mild to moderate limitations in concentration and attention due to pain. He has mild to moderate difficulty interacting with others due to depression.

\*    \*    \*

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on September 4, 1959 and was 42 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

*   *   *

11.  The claimant has not been under a "disability," as defined in the Social Security Act, from March 6, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-27.)

On October 30, 2007, the Appeals Council denied Brown's request for review, making the decision of the ALJ the final action of the Commissioner. Brown filed this action on December 6, 2007.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. §§ 404.1505(a), 416.905(a); see also Blalock v.



Richardson, 483 F.2d 773 (4th Cir. 1972).  The regulations require the ALJ to consider, in sequence:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" impairment; (3) whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"),[1] and is thus presumptively disabled; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant's impairments prevent him from doing any other kind of work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  Id.

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).  The Commissioner may carry this burden by obtaining testimony from a vocational expert.  Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

---

[1]The Listings "is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'"  Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits.  However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  Thus, the court may only review whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589.  In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Craig, 76 F.3d at 589.  Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence. Blalock, 483 F.2d at 775 (4th Cir. 1973).

## ISSUES

Brown raises two issues for this judicial review, alleging that the ALJ erred in: (1) failing to address and weigh evidence regarding Brown's schizoaffective disorder, peripheral neuropathy, diabetic retinopathy, and tinnitus; and (2) failing to properly consider the combined effect of Brown's multiple impairments.  (Pl.'s Br. 2.)

**DISCUSSION**

**A.    Alleged Failure to Evaluate Brown's Impairments**

Brown first asserts that the ALJ erred in failing to address and weigh the evidence regarding Brown's schizoaffective disorder, peripheral neuropathy, diabetic retinopathy, and tinnitus.

**1.    Mental Impairments**

**a.    Schizoaffective Disorder**

The record contains medical documentation of Brown's conditions of severe depression and major depressive disorder, and contains a diagnosis of schizoaffective disorder. On February 9, 2004, psychiatrist Randall Dwenger, M.D. recommended hospital admission for Brown and diagnosed him with major depressive disorder, polysubstance abuse, and a Global Assessment of Function ("GAF")[2] score of 40. (Tr. 204.) Brown was hospitalized and underwent alcohol and drug detoxification as well as psychiatric care from February 9, 2004 to February 20, 2004. During that time Diane Stone, M.D. completed a general intermediate psychiatric evaluation and diagnosed Brown with cocaine dependence, alcohol dependence, and major depressive disorder, as well as assessing a GAF score of 55. (Tr. 107, 462.) On February 20, 2004, Brown was discharged and transferred to a residential alcohol and drug rehabilitation facility. The discharge diagnosis was severe recurrent depressive disorder, and Dr. Stone indicated that Brown's depressed

_____

[2]The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth edition ("DSM-IV"), contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning. According to the DSM-IV, a GAF score below 40 may reflect major symptoms or impairment in social, occupational, or school functioning, while a score between 41 and 50 may reflect serious impairment, a score between 51 and 60 may reflect moderate impairment and a score between 61 and 70 may reflect mild impairment. A GAF score may reflect the severity of symptoms *or* impairment in functioning.

mood had improved significantly and his suicidal ideation was completely resolved. (Tr. 112, 463.) Brown entered the substance abuse residential treatment program on February 20, 2004, completed the program, and was discharged on March 11, 2004. (Tr. 106, 111.) Psychiatrist Anwarul Ahad, M.D. discharged Brown with a diagnosis of alcohol and cocaine dependence, as well as major depressive disorder ("MDD") and a GAF score of 65. (Tr. 106, 111, 460.) On March 11, 2004, Brown was released to a Veterans Administration domiciliary/outpatient homeless program for continued rehabilitation and followup. (Tr. 451, 456.) On March 15, 2004, psychiatrist Helen Schleimer, M.D. completed a psychiatric evaluation, and diagnosed Brown with major depression (single episode), alcohol and cocaine dependence in full early remission, diabetes mellitus, hypertension, and a GAF score of 40. (Tr. 131-32, 460.) Two days later on March 17, 2004, Arthur Russo, Ph.D., a clinical psychologist, made a "provisional diagnosis" of schizoaffective disorder and also of alcohol dependence, cocaine dependence, paranoid and narcissistic personality traits, and assigned a GAF score of 25. (Tr. 125.) Brown completed two of three phases of the domiciliary program prior to discharge on June 25, 2004. His discharge diagnosis included a diagnosis of alcohol dependence in full early remission, cocaine dependence in partial remission, and schizoaffective disorder, along with a GAF score of 40. (Tr. 451-52, 458.)

In 2005 and 2006 the diagnosis of schizoaffective disorder was questioned. In a primary care progress note dated July 13, 2005, the physician noted a history of depression and "?schizoaffective disorder (per pt report)." (Tr. 393.) On November 2, 2005 in a mental health psychiatry consultation, Brown is quoted as saying, "I have an insomnia disorder which is a schizoaffective disorder." (Tr. 359, 375.) Brown's self-reported history of schizoaffective disorder is again questioned in two mental health progress notes dated

January 23, 2006 and February 21, 2006. (Tr. 300, 303.) The progress notes state that Brown "reported a past dx of Schizo-affective d/o, but w/o sxs. to match that dx," and then noted a diagnosis of recurrent depression disorder, severe. (Tr. 300, 303.) In a mental health clinic progress note dated February 21, 2006, the physician noted that Brown was being followed for "MDD with possible psychotic features vs SIPD vs schizoaffective d/o." (Tr. 299.) Several mental health evaluations, both before and after the 2004 diagnosis of schizoaffective disorder, reveal a diagnosis of major or severe depression or depressive disorder. The majority of Brown's mental evaluations contain a diagnosis of severe or major depressive disorder, with only one diagnosis of schizoaffective disorder.

The ALJ found Brown's depression to be severe and evaluated the impairment under Listing 12.04. Schizoaffective disorder is not a separate impairment under the Listings, but can be considered within the framework for depression, and the ALJ's decision reflects this. The ALJ found:

> In order to meet the severity of section 12.04, there must be a diagnosis of depression, bipolar disorder, or manic syndrome, with appropriate symptoms and which results in at least two of the following: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration; or medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support.

> For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment, known as the "B" criteria.

(Tr. 22-23). The ALJ then evaluated Brown's symptoms within the "B" criteria, including Brown's symptoms of paranoia and nervousness around other people, which are the symptoms Brown attributes to his schizoaffective disorder. (Tr. 531-32.) The ALJ

concluded that Brown has mild to moderate limitation in "social functioning." (Tr. 23.) A psychological consultant, G. Peters, Ph.D., found that Brown had moderate difficulties in maintaining social functioning (Tr. 280), which the ALJ noted (Tr. 25), and which supports the ALJ's finding. The hypothetical to the vocational expert includes the instruction to "assume he would have mild to moderate difficulty interacting with others." (Tr. 522.) The ALJ's decision reflects that the ALJ considered and weighed Brown's testimony as well as medical records concerning limitations Brown has due to symptoms he attributes to schizoaffective disorder. Accordingly, the ALJ's decision concerning Brown's mental impairments is supported by substantial evidence.

### b.    Global Assessment of Function Scores

With regard to Brown's mental impairments, Brown also argues that the ALJ erred in disregarding the low GAF scores that Brown received, which represent serious limitations in functioning. The Commissioner contends the lower GAF scores were during a time when Brown was receiving inpatient substance abuse treatment. The Commissioner also argues that Brown also received higher GAF scores indicating moderate to mild limitations to functioning, so that substantial evidence supports the ALJ's conclusion that Brown's depression imposed mild to moderate limitations.

The record reflects that from February 9, 2004 to June 25, 2004, while Brown was receiving treatment for alcohol and drug abuse, including hospitalization and a residential treatment program followed by an outpatient program, Brown was assessed with GAF scores ranging from 25 to 65. During hospitalization in February 2004, he received GAF scores of 40 and 55. (Tr. 204, 462.) During his residential and outpatient treatment, he

received a GAF score of 40 twice, as well as a score of 25 and 65.  (Tr. 132, 452, 125, 460.)

The ALJ determined that Brown's depression was a severe impairment, but that Brown's mental impairments did not have the functional limitations required to meet the Listings.  (Tr. 23.)  The ALJ noted that severity for mental disorders "is assessed in terms of the functional limitations imposed by the impairment."  (Tr. 23.)  Based on the record, including Brown's testimony, medical records, and other evidence, the ALJ found that Brown had mild limitation in activities of daily living, mild to moderate limitation in social functioning, and mild limitation in concentration based on mental impairments.  (Tr. 23.) These mental limitations were also applied in determining Brown's residual functional capacity to perform work, reflected in the ALJ's finding of mild to moderate limitations in concentration and attention as well as mild to moderate difficulty interacting with others. (Tr. 23.)

While the ALJ did not discuss Brown's GAF scores, a GAF score is not considered to have a "direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."  65 Fed. Reg. 50746, 50764-65 (2000).  As Brown acknowledges, a GAF score alone is not sufficient to determine limitations in a person's ability to work.  Narrative explanation in relation to a GAF score is necessary to assess any functional limitations that the score could reflect.  The ALJ's "failure to reference the GAF score[s]" in discussing mental limitations, "standing alone, does not make the [residual functional capacity] inaccurate" and, if error, is harmless.  Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) (stating that a GAF score may be helpful in formulating the [residual functional capacity], but "is not essential to the [residual

functional capacity]'s accuracy"). The ALJ's finding of mild to moderate limitations in concentration and attention as well as mild to moderate difficulty interacting with others is supported by the findings of the psychological consultant (Tr. 266-268), so in any event, a discussion of GAF scores is unlikely to change the result. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result"); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (stating that the court will not set aside an administrative finding based on a "deficiency in opinion-writing" when it is unlikely to have affected the outcome). Accordingly, substantial evidence supports the ALJ's decision concerning mental impairments.

### 2.    Physical Impairments

#### a.    Peripheral Neuropathy

On October 15, 2000, Brown went to the Emergency Room with numbness in his feet, and after noting a history of diabetes mellitus and hypertension, the physician's diagnostic impression was uncontrolled diabetes mellitus. (Tr. 242.) Brown was instructed to follow up with the primary care clinic. Two years later, on October 29, 2002, Brown visited the ER/Urgent Care complaining of numbness and swelling in both of his lower extremities, although the physician observed that "no edema [swelling] noted." (Tr. 237.) A primary care provider was assigned for follow up. In a diabetic foot exam in July 2003, Brown's chief complaint was dizziness, and an examination showed full strength in both lower extremities, as well as no ulceration, mildly reduced pulses, and normal sensation in his feet. (Tr. 230.) On January 14, 2004 in a new patient examination, Brown was diagnosed with "diabetes mellitus without mention of complication, type II or unspecified



type, not stated as uncontrolled" and hypertension. (Tr. 484.) The nurse's notes indicate that Brown complained of pain due to diabetic peripheral neuropathy and an initial prescription of Gabapentin was provided. (Tr. 200-01.) In the comprehensive primary care note (with a chief complaint of shoulder pain), the physician notes that Brown's complaints include numbness in the right hand (Tr. 216-17) and pain in the feet (Tr. 217, 220).

On February 9, 2004, Brown was admitted to the Veterans Administration Medical Center in New York for inpatient treatment to obtain detoxification from alcohol and cocaine abuse, as well as psychiatric stabilization for depression with suicidal thoughts after a failed suicide attempt. (Tr. 152.) On February 17, 2004 during Brown's hospitalization, he reported numbness, but no pain in his feet, and a progress note from that day indicated medication for improving diabetic neuropathy. (Tr. 167-68.) That same day, the kinesiotherapist noted that Brown was able to use the clinic exercise equipment under minimum supervision. (Tr. 168.) On February 19, 2004 during Brown's hospitalization, a physician completed a general intermediate psychiatric evaluation, which noted that Brown "was preoccupied with somatic complaints; he has DM [diabetes mellitus] with peripheral neuropathy with pain and numbness in his feet which made walking uncomfortable." (Tr. 107.) On October 5, 2004, Brown's chief complaint was tinnitus but he also complained of numbness in his fifth digit and his toes, as well as "pins and needles" that increase at night, but he had no complaints of weakness, although he was "limited by leg pain and numbness." (Tr. 431.) Upon physical examination of Brown, the physician found no neurological sensory deficits and continued Brown on Gabapentin. (Tr. 433.) On October 25, 2004, Brown's history of diabetes mellitus with neuropathy and his complaint of foot pain were noted during his visit to the podiatry clinic where the physician assessment

indicated a heel spur. (Tr. 427.) On November 5, 2004, during Brown's first visit to the Neurology Clinic, he complained of numbness and tingling in his feet, among other complaints, and upon exam, the physician noted "decrease pin and touch distally in feet" with an impression of "diabetic neuropathy, mild symptomatic." (Tr. 425.) Although for the first time the diagnosis was diabetic neuropathy, the neurologist also noted Brown's "station and gait are normal." (Tr. 425.)

In January of 2005, Brown moved from New York to South Carolina and returned to the Veterans Administration for continuing medical treatment. On April 11, 2005, Brown's symptoms of intermittent numbness in his digits and toes were noted. (Tr. 399.) On July 13, 2005, the physician noted that Brown's medication for peripheral neuropathy would be continued. (Tr. 393.) In January 2006, in a consultation request for physical therapy, the physician noted Brown's diagnosis of diabetes mellitus with peripheral neuropathy and directed that a physical therapist evaluate Brown's need for a cane or other walking device. A separate note indicated that Brown was seen in physical therapy and was instructed to use a standard walking cane. (Tr. 367-68.) After Brown called on February 21, 2006, requesting a letter for a court hearing stating why he uses a walking cane, the physician wrote that Brown "was given a walking cane following physical and rehabilitation medicine evaluation for diabetic peripheral neuropathy and low back pain." (Tr. 305.) Brown also used a cane at the March 2005 hearing before the ALJ and testified that he used the cane to relieve lower back pain when he stands up. (Tr. 517.)

The ALJ evaluated peripheral neuropathy as a symptom of Brown's diabetes mellitus. He found "no evidence of neuropathy" that met Listing 9.08, which requires "neuropathy demonstrated by significant and persistent disorganization of motor function

in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station."  (Tr. 22.)   In considering residual functional capacity, the ALJ acknowledged that Brown testified to problems of foot pain.  (Tr. 24.)  The ALJ found that Brown's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but Brown's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," because the "evidence does not show strength deficits, circulatory compromise, neurological deficits, muscle spasms, or atrophy which are reliable indicators of long standing pain, physical inactivity or depression." (Tr. 25.)  Based on the record, Brown's peripheral neuropathy symptoms and diagnosis do not support a finding of limitations related to peripheral neuropathy.  Although the medical records contain a diagnosis of mild peripheral neuropathy, the records do not reflect a corresponding loss of functioning or physical limitations.  The record does not reflect how Brown's symptoms related to peripheral neuropathy limit his ability to function in a work situation.  The ALJ's decision indicates that the ALJ considered and weighed Brown's testimony as well as medical records concerning Brown's alleged limitations due to peripheral neuropathy.  The court finds that the record contains substantial evidence supporting the ALJ's conclusions.

### b.    Diabetic Retinopathy

In a diabetic retinal exam on March 3, 2003 Brown was reported to have mild background retinopathy.  (Tr. 232.)  The medical records indicate that Brown complained of intermittent blurry vision on February 9, 2004 when providing general admission information.  (Tr. 198.)  On March 15, 2004, a physician found Brown's vision to be within normal limits upon initial assessment.  (Tr. 132.)  In a retinal exam on May 12, 2004, Brown

was again found to have mild background retinopathy.  (Tr. 478.)  On April 11, 2005, a physician noted "problems with Brown's vision and glasses" (Tr. 399), but included no details.  An assessment of mild diabetic retinopathy was made on June 28, 2005, after a retinal exam.  (Tr. 364, 395.)  Although mild retinopathy was found in three retinal exams, no medications or treatment were prescribed and no visual limitations were noted.

On August 2, 2005, Brown requested another eye exam because he was having problems with reading, but a note on the progress report states that "pt. [was] just seen July and did not mention these issues at that appt." (Tr. 389.)  On September 29, 2005, during a disability evaluation exam by Dr. Daniel Bates, Brown acknowledged he wore glasses and denied loss of vision.  (Tr. 295.)  At the hearing, Brown testified that blurriness limited the time he could watch television, read, and draw, but he did not state any other limitations relating to his sight.  (Tr. 510, 540.)

The ALJ evaluated diabetic retinopathy as a symptom of Brown's diabetes mellitus. He found "no evidence of a visual impairment due to diabetes which meets the criteria set forth in listing 2.00." (Tr. 22).  In considering Brown's residual functional capacity, the ALJ acknowledged that Brown testified to problems of "bleeding of his eyes." (Tr. 23.)  The ALJ found that Brown's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but Brown's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" based on the medical evidence.  (Tr. 25.)

Although the medical records contain a diagnosis of mild diabetic retinopathy, the medical records do not reflect a corresponding loss of functioning or physical limitations. The record does not reflect how Brown's alleged symptoms of intermittent blurriness limit

Brown's ability to function in a work situation.  The ALJ's decision reflects that the ALJ considered and weighed Brown's testimony, his medical records, and other evidence concerning limitations Brown alleged due to diabetic retinopathy.  The court finds that the record contains substantial evidence supporting the ALJ's conclusions.

   **c.**  **Tinnitus**

   On May 19, 2004, Brown was diagnosed with sensorineural hearing loss (Tr. 478), and in a limited initial visit with the otolaryngology attending physician on July 2, 2004, Brown was found to have sensorineural type hearing loss and tinnitus (Tr. 449, 477).  No medications or treatment were prescribed, but a follow up appointment was scheduled for August 6, 2004.  (Tr. 449.)  On October 5, 2004 in a primary care visit, Brown's chief complaint was tinnitus, but the physician only noted the complaint.  (Tr. 431, 433.)  On October 8, 2004 in a follow up visit concerning tinnitus, Brown complained of high-pitched continuous noise with headaches and the physician's assessment included tinnitus, mild hearing loss, and headaches.  (Tr. 429-30, 472.)  The next reference in the record to noise in Brown's ear is a neurology clinic visit on November 5, 2004 in which Brown complained of headaches "associated with eye pins, noise in ear."  (Tr. 425.)  The attending physician's impression was migraine headache syndrome, and the progress note also states an "MRI scan of brain was scheduled but not done," so the plan was to "proceed to have MRI scan of brain."  (Tr. 425.)  The record does not contain a report on an MRI scan of the brain.  On April 11, 2005, a physician diagnosed Brown with tinnitus that caused insomnia, and the insomnia was treated with medication "with good results."  (Tr. 399-400.)  On August 2, 2005 in a phone call, Brown requested an audiology consultation because his "hearing is getting bad" and he "hears echoes and has ringing in his ears."  (Tr. 388-89.)  On



November 2, 2005 in a mental health psychiatry consultation, the physician noted a history of tinnitus. (Tr. 360, 377.) On January 23, 2006 in a mental health interdisciplinary progress note, the professional/behavioral counselor noted Brown's complaint of persistent tinnitus, "this ringing in my ears." (Tr. 300.) Brown testified that he had "constant ringing in [his] ear that just won't cut off" (Tr. 518) which "drives [him] crazy" (Tr. 539) and disturbs his sleep, although medication allows him to sleep (Tr. 519, 539). Brown stated no other limitations related to his hearing. (Tr. 510, 540.)

In considering residual functional capacity, the ALJ acknowledged that Brown testified to problems of "ringing in his ears." (Tr. 23.) The ALJ found that Brown's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but Brown's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" based on the medical evidence. (Tr. 25.) Although the medical records contain a diagnosis of tinnitus, the records do not reflect a corresponding loss of function or physical limitations based on Brown's hearing. Brown's complaint of insomnia based on tinnitus was addressed with medication, which Brown acknowledges allows him to sleep at night. (Tr. 518, 399-400); see Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"). The record does not reflect how Brown's symptoms related to tinnitus limited Brown's ability to function in a work situation. The ALJ's decision shows that the ALJ considered and weighed Brown's testimony as well as his medical records concerning the limitations Brown alleges due to tinnitus. The court finds that the record contains substantial evidence supporting the ALJ's conclusions.

Although the medical records contain a diagnosis for peripheral neuropathy and diabetic retinopathy, which are secondary to diabetes, as well as tinnitus, the medical records do not contain findings that indicate the conditions limit Brown's ability to function in a work situation. As the ALJ noted, "[n]o treating source has concluded that the claimant is unable to work." (Tr. 25.) The fact Brown has been diagnosed and treated for specific medical conditions does not mean that the conditions were found to significantly impair his ability to engage in basic work activities. A diagnosis alone does not establish disability, rather, a plaintiff must also show a "related functional loss." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Thus, functional limitations—not diagnosis—are the focus in determining disability.

## B.    Residual Functional Capacity Based on Physical Limitations

Brown claims that the ALJ's finding that Brown retained a residual functional capacity ("RFC") to perform light work[3] is not based on substantial evidence because the ALJ failed to consider all of Brown's physical impairments and improperly rejected supporting medical evidence.

An RFC assessment "must address both the remaining exertional and nonexertional capacities of the individual." SSR 96-8p, 61 Fed. Reg. 34474, 34477. Exertional capacity is defined as "an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting,

---

[3]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b) and 416.967(b). The full range of light work includes the ability to stand or walk, "off and on, for a total of approximately 6 hours of an 8-hour workday," with sitting possibly occurring "intermittently during the remaining time." See SSR 83-10, 45 Fed. Reg. 55566.

standing, walking, lifting, carrying, pushing, and pulling." Id. Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions." Id. Nonexertional capacity assesses the ability to perform activities such as postural, manipulative, visual, communicative, and mental work-related limitations, as well as the ability to tolerate various environmental factors. Id. After considering these, the "RFC may be expressed in terms of an exertional category, such as light." Id. at 34476.

As discussed above, the record contains evidence of Brown's diagnoses and symptoms related to peripheral neuropathy, diabetic retinopathy, and tinnitus. The record reflects that the ALJ requested a disability evaluation of Brown, which was performed by Dr. Daniel Bates, a state agency medical consultant, on September 29, 2005. (Tr. 295-98.) Dr. Bates noted that he reviewed limited medical records, with no records from the prior eighteen months. Brown complained of back and foot pain, fatigue, sleep disturbance, abnormal activity level, dizziness, edema (swelling), dyspnea (shortness of breath), neck pain, limitation of motion, joint pain, muscle pain, stiffness, and weakness. (Tr. 295.) Brown stated that he could walk for only two minutes, stand for three minutes, and sit for thirty minutes, that he had some difficulty using stairs and chairs, and that he needed assistance with socks and shoes, but not bathing. (Tr. 295.) Brown denied loss of vision or hearing. Dr. Bates noted that Brown appeared alert and "in no acute distress." (Tr. 296.)

Dr. Bates's physical exam of Brown showed "normal" head, eyes, ears, nose, throat, neck, chest, cardiovascular system, breast, lymph nodes, and digits. (Tr. 296.) The

abdomen was found to be obese.  In examining the musculoskeletal system Dr. Bates found Brown's gait somewhat "flatfooted" and "slightly ataxic heel-to-toe."  (Tr. 296.)  An examination of the cervical spine revealed "no deformities, misalignment or mass" and no tenderness to palpation.  (Tr. 296.)  Dr. Bates found Brown's range of motion and stability to be normal.  The thoracic spine was also found to be normal, with a normal range of motion and stability, and not tender to palpation.  (Tr. 296.)  An inspection of the lumbar spine revealed normal lumbar curvature, no tenderness to palpation, but a "reduced range of motion due to obesity."  (Tr. 296.)  The left and right upper extremities were "swollen from obesity," with a normal range of motion in the left arm, but "reduced range of motion of shoulder with pain."  (Tr. 296.)  The left and right lower extremities were "swollen from obesity" but had a normal range of motion.  (Tr. 297.)  A neurological inspection noted reflex of "2+ upper and both knees" but "0 ankles."  (Tr. 297.)  Dr. Bates ordered x-rays of the spine, which were reported as normal, as well as the right shoulder, which was also normal with the exception of a "possible subacromial spur."  (Tr. 298.)

In a Statement of Ability To Do Work-Related Activities, Dr. Bates indicated that Brown could lift twenty pounds occasionally and less than ten pounds frequently.  He could walk or stand for at least two hours and sit for less than six hours in an eight-hour work day. He had limited ability to push and pull with the upper extremities, but not in the lower extremities, based on "pain and slightly restricted motion" in the right shoulder. (Tr. 291-92.) Dr. Bates indicated that Brown could never climb, balance, kneel, crouch, crawl, or stoop based on "poor proprioception due to diabetes" and "morbidly obese - restricts all movement."  (Tr. 292.)  Dr. Bates also found that Brown was limited in manipulative functioning in reaching, fingering, and feeling, but was unlimited in handling; however, he

provided no basis for his conclusions concerning such limitations. (Tr. 293.) Dr. Bates found unlimited functioning in Brown's ability to see, hear, and speak. (Tr. 293.) Finally, Dr. Bates found environmental limitations of extreme temperature and hazards, such as machinery or heights, "due to obesity and poor proprioception." (Tr. 294.) Dr. Bates made no further findings or comments concerning Brown's limitations.

The record also contains an undated Physical Residual Functional Capacity Assessment by M. Cohen, who found that Brown could lift fifty pounds occasionally, but only twenty-five pounds frequently. Cohen further found that Brown could stand, walk and/or sit about six hours each in an eight-hour work day. He found no limitations on pushing and/or pulling and that Brown could frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 55-56.) The assessment was based on Brown's pain and limitation of motion of the right shoulder, although a negative MRI of the shoulder was also noted. Additionally, the assessment noted "dorsalis pedis pulses mildly reduced," which relates to palpation of an artery that carries blood to the foot. (Tr. 55.) The assessment also found no manipulative, visual, hearing, speaking, or environmental limitations. (Tr. 57-58.) Brown's symptoms included pain and numbness in the shoulder, legs, feet, and back. (Tr. 59.) The examiner also noted there were "no medical source statements in the file." (Tr. 60.)

Brown contends that the ALJ's hypothetical to the vocational expert[4] at the March 2005 hearing was flawed because the question did not take into account all of the evidence

---

[4]Vocational experts are "persons who have, through training and experience in vocational counseling or placement, an up-to-date knowledge of job requirements, occupational characteristics and working conditions, and a familiarity with the personal attributes and skills necessary to function in various jobs." Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).

concerning Brown's physical limitations of neuropathy, retinopathy, and tinnitus. More specifically, Brown contends the hypothetical did not contain a sit/stand option or otherwise reflect the limitations caused by neuropathy, as well as retinopathy and tinnitus. The hypothetical to the vocational expert stated:

> Assume I find the claimant is 45-years-old and has a 12th grade education, assume I find he can perform light work. Assume he is unable to perform overhead work, assume he would have mild to moderate difficulty interacting with others and assume also he would have mild to moderate limitations in concentration and attention due to pain. With those limitations could he perform any past relevant work?

(Tr. 522-23.) The vocational expert responded that Brown could not perform past relevant work, but could perform three jobs available in the national and local economy that were light, unskilled jobs.[5]  (Tr. 523.)

"In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record of the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993). However, the hypothetical question need only contain the impairments supported by credible evidence. See Johnson v. Barnhard, 434 F.3d 650, 659 (4th Cir. 2005) (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)). Accordingly, if the record does not support the existence of a limitation, the ALJ need not include it in the hypothetical question. See Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); see also Robbins v. Soc. Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006); Rutherford

---

[5]The ALJ also asked the vocational expert an additional hypothetical question, to "[a]ssume the same elements as the first hypothetical except instead I would find moderate to severe limitations in concentration and attention. With that increased degree of limitations could [Brown] do any of the jobs identified, or if not, any other jobs?" (Tr. 523.) The vocational expert responded that severe problems in concentration and attention "would prevent the jobs previously given" and all other jobs as well. (Tr. 523.)

v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Shepherd v. Apfel, 184 F.3d 1196, 1203 (10th Cir. 1999).  As indicated above, substantial evidence exists in the record to support the ALJ's decision to exclude from the RFC several of the limitations and restrictions alleged by Brown based on the diagnosed conditions of neuropathy, retinopathy, and tinnitus.  See Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (stating that little weight may be accorded to an opinion based mainly on the plaintiff's subjective complaints); Gross v Heckler, 785 F.2d 1163, 1165-66 (4th Cir. 1986) (stating that a mere diagnosis of a condition is not enough to prove disability).  The hypothetical question presented by the ALJ at the hearing was appropriate and included all of Brown's limitations found to be credible by the ALJ.

Brown's argument that the hypothetical is in error for failing to contain a sit/stand option is contrary to medical findings of Brown's limitations.  Although Brown told Dr. Bates he could only walk for two minutes, stand for three minutes, and sit for thirty minutes (Tr. 295), Dr. Bates found that in an eight-hour day, Brown could stand/walk at least two hours and sit for less than six hours.  Dr. Bates specifically did *not* find that Brown "must periodically alternate sitting and standing to relieve pain or discomfort" and did not choose the sit/stand option on the assessment form.  (Tr. 292.)  No medical findings support Brown's contention that the ALJ should have included a sit/stand option in the RFC assessment and vocational expert hypothetical question.

The ALJ called into question the credibility of Brown's complaints concerning the intensity and duration of his symptoms, pointing out they were not supported by the evidence in the record.  (Tr. 25.)  Further, the ALJ is not bound by findings made by a state agency medical consultant, but the ALJ's decision must explain the weight given to the

consultant's opinion.    SSR 96-6p, 61 Fed. Reg. 34466, 34467.    Moreover, state consultants' opinions "can be given weight only insofar as they are supported by evidence in the case record," and the opinion is consistent "with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist."    Id. at 34467-34468.    In considering Dr. Bates's opinion, the ALJ explained that he gave little weight to Dr. Bates's opinion concerning standing, sitting, postural, and manipulative limitations because the record, including Dr. Bates's "relatively benign clinical findings upon his examination" of Brown, did not support the physician's opinion in those areas.  (Tr. 24.) Dr. Bates is the only source that suggested Brown had very limited ability to stand/sit or had severe postural limitations.  The other state agency examiner, in his Physical Residual Functional Capacity Assessment, found Brown could stand, walk and/or sit for at least six hours each in an eight-hour work day, with frequent climbing, balancing, stooping, kneeling, crouching, and crawling.  (Tr. 55-56.)  This finding places Brown's residual functional capacity in the light category, which includes the ability to stand or walk, "off and on, for a total of approximately 6 hours of an 8-hour workday," with sitting possibly occurring "intermittently during the remaining time."    See SSR 83-10, 45 Fed. Reg. 55566. Ultimately, "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."  Pearsall v. Massanari, 274 F.3d 1211, 1218-1219 (8th Cir. 2001); see also Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJs, not with a reviewing court.").

        Substantial evidence supports the ALJ's decision to incorporate portions of Dr. Bates's residual functional capacity assessment as well as reject other portions of Dr.

Bates's opinion which were unsupported by or inconsistent with the record. The ALJ summarized Dr. Bates's opinion evidence, and listed all of the restrictions and limitations indicated by Dr. Bates. (Tr. 24); see SSR 96-8p, 61 Fed. Reg. 34474, 34478 ("The RFC assessment must always consider and address medical source opinions."). The ALJ then explained that he gave "little weight" to the postural limitations found by Dr. Bates, based on the lack of clinical or medical evidence in the record to support the determination. See SSR 96-8p, 61 Fed. Reg. 34474, 34478 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). The ALJ did not err in giving little weight to Dr. Bates's opinion concerning Brown's ability to sit, stand, and/or walk in an eight-hour work day, as well as Dr. Bates's opinion of Brown's postural limitations. The ALJ sufficiently explained why he disregarded some of Dr. Bates's opinion.

Therefore, the hypothetical question was not required to include a sit/stand option that was not supported by the record. Nor was the ALJ required to include Brown's alleged postural limitations, such as stooping, in the hypothetical presented to the vocational expert, because the ALJ determined that Dr. Bates's findings concerning postural limitations were not supported by the record. The governing standard is that the hypothetical should include all of the claimant's impairments that are supported by the evidence in the record. See Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000); Cass v. Shalala, 8 F.3d 552, 556 (7th Cir. 1993). Thus, the ALJ did not have to state a sit/stand option, or postural limitations, in the vocational expert hypothetical if he found that those limitations were not supported by the record.

**D.    Combination of Impairments**

Brown's final argument is that the ALJ failed to consider the combined effect of his multiple impairments.  When a person claims a combination of disabilities that is not contained in the Listings, the claimant has the burden to demonstrate that the combination of disabilities "medically equals" a listed impairment.  20 C.F.R. § 404.1526(a).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the elements shown in the listing of that impairment.  20 C.F.R. § 404.1525(d).  Medical equivalence can be found if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526(a).  "Medical equivalence must be based on medical findings, " and "must be supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1526(b).  Also, a claimant must establish that there was a "twelve month period . . . during which all of the criteria in the Listing of Impairments [were] met."  DeLorme v. Sullivan, 942 F.2d 841, 847 (9th Cir. 1991) (finding that the claimant's back impairment did not meet the requirements of section 1.05C) (remanded on other grounds).  Brown has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and the Act requires him to furnish medical evidence regarding his condition.  See Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987).

The ALJ in this case considered whether Brown's impairments met or equaled the Listings at § 9.08, § 2.00, § 12.04, and § 12.06, and found that Brown did not have an impairment, or combination of impairments, that met or medically equaled these Listings.



(Tr. 22-23.)  Brown argues the ALJ erred in not fully explaining how Brown's multiple impairments in combination fail to meet a Listing.  Brown relies on <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir 1989), which held that "[i]t is axiomatic that disability may result from a number of impairments which, when taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."  The <u>Walker</u> court found that the ALJ discussed each of claimant's impairments, "but failed to analyze the cumulative effect the impairments had on the claimant's ability to work."  <u>Walker</u>, 889 F.2d at 49.

The ALJ in the present case did not fail to consider the cumulative effect of Brown's impairments.  The ALJ found that Brown had severe impairments of morbid obesity, depression, and diabetes mellitus, but that Brown's alleged back pain was non-severe.  (Tr. 22.)  The ALJ's discussion of the listing for diabetes mellitus included neuropathy and visual impairment, which includes diabetic retinopathy, two of the impairments Brown claims were not considered.  (Tr. 22.)  As discussed above, the record contains substantial evidence to indicate the ALJ properly considered the cumulative effect of all of Brown's medically determinable limitations, physical and mental, in deciding Brown's RFC.  Additionally, the record contains substantial evidence to support the ALJ's conclusion that Brown's limitations, in combination, do not render Brown unable to engage in any gainful work activity.  Thus,  even if there was some merit to Brown's contention that the ALJ erred in not discussing in detail Brown's multiple impairments in combination, the error is harmless. <u>See</u> <u>Senne v. Apfel</u>, 198 F.3d 1065, 1067 (8th Cir. 1999) (stating that the court will not set aside an administrative finding based on an "arguable deficiency in opinion-writing technique" when it is unlikely to have affected the outcome); <u>Fisher v. Bowen</u>, 869 F.2d

1055, 1057 (7th Cir. 1989) (refusing to remand where there was no "reason to believe that the remand might lead to a different result").

## RECOMMENDATION

Despite Brown's claims, he fails to show that the Commissioner's decision was not based on substantial evidence.  This court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered *de novo*, a different result might be reached.

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence.  Richardson v. Perales, 402 U.S. 389 (1971).  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  Blalock, 483 F.2d 773.  The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion.  Shively v. Heckler, 739 F.2d 987 (4th Cir. 1984).  For the foregoing reasons, the court recommends that the Commissioner's decision be affirmed.

*Paige J. Gossett*

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

February 13, 2009
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985).